Good morning, your honors. May it please the court, Joseph Porta on behalf of the petitioner. This is an immigration case, particularly an asylum case, with some pretty egregious facts. The petitioner was arrested while practicing his religion. He was detained during that meeting. He was beaten, stripped of his clothes. Can you speak a little louder, please? I apologize, he was... No, and also, I just want to tell you, the clock isn't running for some reason, and it's ten minutes per side, but just go ahead, I think we can gauge it pretty clearly. Very well. The petitioner in the instant case was arrested while practicing his religion. He was stripped of his clothes, placed in a cell naked for two days during the winter, and his religious freedom was restricted. Now, that should be something that meets the burden of proof. However, in the instant case, the immigration judge manifestly used items that were manifestly trivial to justify a credibility determination, and then based on that, found that the petitioner had not met his burden of proof. Now, this is a post-Real ID Act case? It is a post-Real ID Act case, Judge Wurla. And basically, the judge found that the petitioner required corroboration of things that were not central to his asylum case that had nothing to do with the particular reason which he was arrested. Now, I want to go through the credibility determination one by one. The first issue that the judge found that the petitioner... why he was not credible was regarding the petitioner's travel. The petitioner, after he was arrested, had his movement restricted somewhat. Now, initially, the judge asked the petitioner directly, did you have any restrictions about moving around the city? And he said no. And later in the hearing, he was asked, well, what problems would you have if you returned? He says, well, when I left the country, I didn't report it to the authorities who were surveilling me, and that would cause me problems. Now, the judge, it's a difference of the word in or around. He had problems traveling, but not around the city. He was allowed to move within the city, but he wasn't... Wasn't there just a reporting requirement? Yes. It wasn't a restriction. It was just a reporting requirement, right? He was surveilled, yes, and he had to report, correct. Okay. But by traveling abroad, he actually failed to report, so it breaches that. It's splitting hairs at best, Your Honor, but it really is nothing substantial. The second item... Since we're limited on time, can I ask you about a couple of the determinations that were made? Because I think you talk about the travel and whether that's an inconsistency, and even if we agree with you that Mr. Jang did not provide inconsistent testimony about his, I think it was his, termination and about his wife's involvement in providing him with termination documents, I'm more focused, or I'd like to hear from you, on how Mr. Jang's testimony that he was fired, consistent with that termination agreement document, which states that the termination was mutually agreeable. Can you talk about that? Well, I'll turn the Court's attention directly to the agreement, which is in the records. That's at page 236. And it basically reads, Party A would be the company and Party B would be the petitioner. Now, it says both Party A and Party B agree to terminate the employment agreement that was made on March 17th. Now, immediately underneath that, it says Party A requests to terminate the agreement, meaning the employer requests to terminate the agreement. And if we continue reading further down, it states that the document was signed for by the petitioner's wife, and it even indicates that it was signed for the petitioner by his wife. In the testimony, it shows that the petitioner was very upset by the decision that he was terminated, and he left the room, and his wife remained behind since she was also employed at the same company and basically took the documents for him. I don't believe there's any inconsistency at all. It's kind of a – it was a unilateral decision by a company, and they make it look like it's something mutual when, in fact, he was terminated by his employer, which is a state-run company. I don't understand how the IJ could have missed that. I mean, this was presented to the IJ. The arguments were made to the IJ. It was – the arguments weren't – the agreement was made – it was given to the IJ. It – a lot of the basis for the credibility determination was brought up for the first time during the oral decision. So it wasn't necessarily that the parties were on notice regarding something like this. How about – how do you account for Mr. Jang's inability to explain the visa stamp in his passport that looks like – or at least it appears it contradicts his testimony that he applied for a United States visa only one time? He testified – all I can go off is the record, and the record basically testifies that he didn't. Now, if we look closely at those stamps – I'm sorry. The record what? The record states that he said, I never applied for one. Right. And the judge is making some reference based on some extrajudicial knowledge regarding something in a foreign affairs manual which hasn't been cited in the record regarding what the stamp may be consistent with. I'm not sure necessarily. Well, but he did have a visa stamp in his passport, right? I believe what the judge is referring to, Your Honor, is on page 282 is the last page of the petitioner's passport. And there appears to be a stamp with the date of November 27, 2003 on it. And according to the immigration judge's reasoning, that – according to her, that is something that is consistent with someone attempting to apply for a visa and probably getting a refusal, and then they stamp your passport as being received. That seems reasonable, doesn't it? I mean, so, I mean, how do we explain, then, his testimony? I don't know because the testimony, he says he never applied for one. All these items predate. Well, but doesn't that directly contradict it? I'm just going based on what the record shows. I'm just – there is a stamp in the passport. We're not entirely sure what that stamp is. There's nothing in the record other than the judge's speculation that this is what it is. There's nothing indicating that it's anything else. I believe, and it's – the stamp also predates the respondent's religion. It also predates a lot of the other travels that he was doing where the petitioner testified that the company was taking care of a lot of these visas. Who knows what this stamp is? But it doesn't contradict the petitioner's testimony, which stands unrefuted, regarding when he was arrested, why he was arrested, which were all events subsequent to these travels. Now – How about the allegation or what's in the – the alleged inconsistency in Mr. Zhang's testimony that he was detained for two weeks at the end of December of 2004 but then also apparently appeared at the Chinese government office during that same period? I'm not entirely sure about that discrepancy, Your Honor. I didn't. Well, I think there was a testimony that he was detained for two weeks at the end of December 2004, but then he also stated he physically appeared at a Chinese government office during the same period of his detention. I'm not sure. There's really nothing to elaborate on that, and there was no opportunity to necessarily explain it. This was brought up basically at the time of the decision. I didn't notice any discrepancy in that aspect. He was detained, and he got out two weeks later, and that's when he went back to his work unit and he received a termination letter, or his wife did at least. The petitioner here, there's – and the one thing that's very telling in this case is if you read the record very carefully, the judge appears to hang her hat mostly on these stamps and the passport, and her reading of the stamps is completely incorrect. Looking at the stamps, they completely corroborate that which the judge wanted to corroborate later. The stamps show that the petitioner left China in 2003 in December on the 15th, and that he entered Japan and that he came back to China the following November in 2004, about a month or so before he was arrested and detained. Now, the judge just got that wrong. She misread the stamps, and based on that, started to nitpick and basically got the petitioner in a gotcha and thought that the petitioner had done something not credible here. But as a matter of fact, the stamps, if you read them through, they do show that they coincide with everything that's on the written materials and the petitioner's testimony. Now, speaking, leading to the corroboration requirement, he wasn't advised during the hearing that he required the corroboration. This requirement came up during the oral decision, and this appears to offend Ren V. Holder, which is a case subsequent to the case granted. However, more than that, I don't even think we need to get to a Ren V. Holder situation because the Real ID Act requires corroboration if the petitioner hasn't met his burden of proof. Now, assuming that the credibility determination is flawed, the petitioner has testified that he was detained, arrested, beaten, and stripped naked for two days. Someone would be hard-pressed to find, based on his religion, someone would be hard-pressed to find that that's not past persecution and wouldn't afford him a rebuttable presumption to the point where no corroboration is required. Now, even assuming that corroboration is required, just like an adverse credibility determination is based on the totality of circumstances and doesn't provide an IJ a blank check to ask for whatever they want, the same should hold true for a corroboration requirement. Here, the petitioner is being asked to corroborate something that's not central to his claim. There was no indication that any of his activities in Japan had any basis at all whatsoever with his detention on Christmas Eve. They were totally unrelated. They were completely unrelated. He was arrested while attending a Christmas Eve meeting with his church members domestically in China. There was no reference made during his arrest that any of the materials he had sent back from Japan had anything to do or had alerted authorities to him being in that meeting. We are unsure as to the reason. But for the immigration judge to now require that corroboration when she, in fact, made a mistake on the credibility determination, to me is a little bit disingenuous and it's overreaching. I would like to reserve the remainder of my time. Okay. You're out of time, Ben. I'll give you a minute if you still feel you need it after the government's argument. Thank you. Good morning. May it please the Court, my name is Dallin Holyoke, a trial attorney with the United States Department of Justice, and I respond to Attorney General in this matter. Contrary to Petitioner's argument, there are several unrebutted inconsistencies in his claim that provide substantial evidence of his lack of credibility. Moreover, he failed to reasonably provide corroboration, which served as yet another basis to find him not credible and deny his applications for relief in court. Well, first I would like to move directly on to the inconsistencies that the immigration judge found. I think the most important inconsistency in this case was his prior visa application. Mr. Jang applied for a United States visa before any of the events he described. How do you know that? Explain to me how just from that date stamp in the passport that we know anything else about it from this record. What we know is, as the immigration judge pointed out, that's consistent with the consular manual. Wait, how does she know that, though? Wasn't that, I mean, there's a date, and you can't read anything else. Everything else is illegible. Right. The copies, I'm sure, are a bit difficult to read. I noticed that as well. Do you have the original? But in the original, there's a stamp, and it comes from the United States Government Visa Office, and it says that it's from, at the very least, November 27, 2003. Did she have the original? Did the I.J. have the original? The alien would have presented his original passport to DHS, and then these copies would have come to his office. Would have? How do you know that? Did he? I think if you look at the record, the alien presented his original passport. In fact, the original documents are almost always required. It says 27 November 2003, but it doesn't say anything else. It just says he applied. And what we know from what the immigration judge stated was that this is consistent with what a consular officer would do. Does it say somewhere on here that he applied? All we know is that's what they would do, is they would stamp it as having come in. How do we know that? Because, as I said before, what we know from what the immigration judge stated is that the consular manual says that. And she quoted, the immigration judge quoted the manual? She referred to the manual. I'm not sure if she actually quoted it. Did she have the manual in front of her? Do we have the manual on the record? We don't have the manual on the record. I mean, I'm still at a total loss as to what we can say that this stamp stands for. We don't have anything about it. At very least, Your Honor, I don't believe it. I guess we have to look back at the standard of review. And in this case, Petitioner has the burden to provide compelling evidence that the immigration judge was wrong. So it's actually his burden to come to this court and prove to you that that stamp was not a receipt. Well, and what if it was? So if it was. So what that does is it actually undermines his entire claim. Why? Because it shows that he actually had an intention of coming to the United States before any of these events allegedly arose. Could he have had that intention because he happened to be a Christian in a country that doesn't tolerate the Christian religion? He could not, Your Honor, because at that time he had not converted to Christianity. So at that time, according to his claim, he hadn't actually become a Christian yet. Now, we know for sure he was terminated by the company. We have that documented in the record, right? That's right. I'd actually believe that's one of the major inconsistencies, Your Honor. Well, tell me, how does his motive say he intended to come earlier? How does that undermine the motive that he actually did come? Well, what it does is it shows that he already had an intention, that his whole entire plan. What does that prove? It proves that before he actually came up with these ideas, or before he came up with the story, that he was persecuted and then came to the United States because of that reason. He actually already had the intention of coming to the United States. All it proves is he wanted to come to the United States. It doesn't prove anything about the credibility of the actual reason. Your Honor. You're backing up the wrong tree. So move on to the next one. Well, okay. I think totality of circumstances. I'm telling you that. You're absolutely unimpressive with the first one. Then let's move on to the second one, because I think when you look at this, the totality of circumstances, they all come together. The second one that I think is very important, he stayed in China. That's inconsistent with his testimony that he actually feared persecution. He didn't just stay for a few days. He stayed for six to eight weeks. And as I.J. pointed out, this is significant. So if you look at the record, his visa was issued on January 26, 2005. That's at the record of page 272. He didn't arrive in the United States until March 11, 2005. Significant. If you're actually fearing persecution for your life, it seems that you would make faster preparations to leave. And this was an individual who hadn't traveled internationally before. So certainly this individual, if they actually feared persecution, would have left faster. Again, it is a non sequitur. Obviously, to make a change of location of that magnitude may take a lot of time. We don't know. It's true. We don't know any reason why he stayed or didn't stay. We don't. And it's his burden to prove. So you're speculating. It's his burden to prove that there's compelling evidence to demonstrate that he stayed for other reasons, or he was continuing to be persecuted, or he didn't fear that. I don't. But does that leave the I.J. free to speculate? I don't think so. I think at very least, as we pointed out in our brief, the I.J. is in a unique position to evaluate credibility. And they have the right to use their common sense. And when you add all of these things together, and the I.J. is watching this individual testify and they're seeing the case develop in front of them, the I.J. does have the ability to use common sense. Was he asked why it took that much time before he left? Your Honor, I think that that was his burden to present, no matter what. No, no. I mean, isn't someone supposed to ask him to explain if they're going to ‑‑ I mean, the I.J. is supposed to ask him to explain something before he finds a discrepancy or an inconsistency. Your Honor, when you look at the record, I don't see that the I.J. has actually asked him specifically to explain. The immigrant is supposed to be given the opportunity to explain something that the I.J. is going to find inconsistent. And there might, for all we know, there could be a very good reason he doesn't have to volunteer it, because it's a surprise when the I.J. comes out with this and says, oh, and that's an inconsistency, and that's an inconsistency. How does he explain it then? You're right, Your Honor, but what I see there is that this was the court of his claim. Why was he staying in China? That's something that if anybody who's actually appearing for the life would actually claim. Well, he was married. Do we know if he has children? He was married. He does state that he has a child. Neither of them are Christian, and they remain in China. Right. Well, I'm just saying, well, you know, maybe it's kind of hard to leave your wife and your child. It could be. But I think if you're actually appearing for persecution, it's a different claim. I think that then the most important one then after that is his termination agreement. And the IJ did have good concern over the authenticity and the chain of custody of this termination letter. First, he claimed that he did not have the letter, and he needed to get it from his former employer. You can see that right in the record at pages 80 through 81. He's even granted a six-month continuance after already having three months to obtain it. But then he claimed that his wife had mailed it to him. But suspiciously, he couldn't produce the envelope to prove when she mailed it or that she'd actually mailed it from China. But then he explained that he actually had the letter, his wife had the letter all along, because, well, either A, it was given directly to him, or B, his wife received it after he refused to sign it. This, so the big question here was if the immigration judge was just supposed to forget the earlier statements in support of continuance, the lack of the envelope, or why he first said it was given to him without explaining more. Clearly, this was flavored upon truth. And you add this into the totality of circumstances, and it is questionable. Then if you do look at the document, there is a reasonable explanation that perhaps it was written as a mutual termination agreement, but it was unilateral. But at the same time, when we look at the standard review, he needs to have compelling evidence that proves his side of the case that it was actually unilateral. I'm not sure if this is the biggest issue in the termination agreement. I actually believe the bigger issue in this case was his first request for the continuance, saying that they didn't have it, they had to get it from the former employer, and all of a sudden it never needed to come from the former employer. I think right there you know the case cannot be true, because if he already had the letter, his wife already had the letter, then there was no need for their statements in furtherance of their continuance. I also think that when you look at this, there's also a glaring inconsistency in that letter. It says that his employment began on March 17, 2002. But when you look at his employment history, in his asylum application, which does indicate two different positions with the same employer, there's absolutely no change in his employment on March 17, 2002. He never sought to authenticate this document, which he could have done, and he didn't provide the original to DHS on this document when you look at the record. So DHS never had to agree that it was authentic. So when you look at that, there's no way he could have been consistent. And this is a post-Real ID Act asylum claim. There's no way the immigration judge could have granted his asylum claim based on credibility, at least for those three inconsistencies. When you also, there's so many more. The Christmas issue. That was implausible. He claimed he worked for an employer and that they dismissed him early for Christmas. Yet later on, his same employer that dismissed him early for Christmas decided that they needed to dismiss him because he was engaging in Christian activities. He never explained this inconsistency. That's huge. Do you not know that Christmas Eve is a secular holiday in China? Well, and that's the next point, Your Honor. He submitted a document to the board claiming to argue that Christmas is a secular holiday in China. Isn't it a secular holiday in the United States too? Doesn't everybody get Christmas Eve on Christmas? Your Honor, China doesn't generally provide it for everybody. It's just his employer that provides it. How do you know that? Do you have a State Department record of that? His document that he submitted to the board is what explains that, that some employers are allowing people to dismiss early and they consider it a general secular holiday. Just like in the United States. Just like in the United States. And elsewhere in the rest of the world. Right, but in the United States we don't have the same level of international issues. We don't have the same level of persecution. Right, right. And that could be true, Your Honor. That's right. That could be true. But I think the most important thing about this article, though, is that it actually doesn't support his case. It undermines his case. So first he claimed the board didn't review it, but the board does have the presumption of regularity that it did review the record before. But second, the article undermines his case because it doesn't comport this claim that the Chinese government is cracking down on those that are celebrating the holiday. And, in fact, if you look at the end of the IJ's decision, IJ notes that there is a large percentage of individuals who are actually practicing Christian beliefs in China now, and that number of people cannot all be possibly being persecuted. So the issue here is he submitted an article that actually undermined his case. As you know, we have a lot of these cases, and it's a very sporadic persecution. You don't find everybody persecuted. Of course not. Well, anyway. All right. Thank you. You're doing the best you can. I know. Thank you very much. You're over your time, your minute and 30 seconds over your time, so I'll give your present. Can I ask you one more thing? One more thing? About the rent issue. Okay. I just want to agree with him. This is not a rent case. He agreed. He stated this is not a rent case, and I just want to make it clear that we as a government also don't see this as a rent case. Okay. As a rent case, rent versus holder, had to do with otherwise, had to do with determinations where individuals are otherwise found credible, but then there are some applications that deny the fact they did not provide corroboration. In this case, we see it as the corroboration only fed into the lack of credibility. Thank you. All right. Thank you very much. You have a minute. Very quickly, so I'm not misquoted. I don't believe this is a rent case because I think the petitioner has met his burden of proof, and we don't get to rent regarding the corroboration. However, if there may be something that questions the petitioner's credibility, then it would apply to rent, and he's required to have notice and an opportunity to respond. Secondly, counsel noted that the petitioner was inconsistent in testifying regarding the proof that he was trying to submit. That's not true at all. It was the petitioner's counsel that was fumbling, saying we need some time to try and get this. I'm trying to contact this. I'm trying to contact that to get the documents. It was not petitioner testifying. The person that spoke was not even under oath, and it could have just been a slip of the tongue. But it's not the petitioner's statements that are being weighed against. It's his counsel's, and his counsel was just asking for a continuance. So there's not enough latitude, and they weren't questioned on it. Regarding the authentication issue that was raised, that document was admitted without objection. So for the IJ as an afterthought to raise the authentication issue, I think, is not proper. And regarding the Christmas aspect of it, the petitioner wasn't dismissed for secular activities. He was dismissed because now he can give the company a bad name because he was arrested for practicing religion. Having the holiday off for Christmas because it's a time to spend with friends and family, as the newspaper article was submitted, is completely different than actively engaging in something that's seen as a threat to the Communist Party, which would be engaging in religion. Thank you, Your Honors. I ask that the case, I believe there's enough evidence here, to actually grant the petition for review and to send back with instructions to grant the case. All right. Thank you very much, counsel. Both counsel did a nice job of arguing this today. In this case, Zhang V. Holder will be submitted.
judges: Noonan, Wardlaw, Murguia